IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA
555 4th Street, N.W.
Washington, D.C. 20530

Plaintiff,

v.

DRC, INC., a/k/a
DISASTER RELIEF CONSTRUCTION, INC.
740 Museum Drive
Mobile, Alabama 36608,

Defendant.

CASE NUMBER 1:04CV01608

JUDGE: Richard W. Roberts

DECK TYPE: Contract

DATE STAMP: 09/16/2004

## COMPLAINT OF THE UNITED STATES

The United States of America, on behalf of the United States Agency for International Development (USAID), and by and through the United States Attorney for this judicial district, represents as follows:

### Introduction

1. This is a civil action brought by plaintiff, the United States of America, to recover treble damages and civil penalties under the False Claims Act, 31 U.S.C. §§ 3729-33, as amended, and to recover damages under the common-law theories of payment by mistake, unjust enrichment and fraud.

### The Parties

2. Plaintiff is the United States of America. The transactions that are the subject of this complaint involve agencies of the United States, namely USAID, and payments made with United States' funds.

3. Defendant, DRC, Inc., a/k/a Disaster Relief Construction, Inc., ("DRC"), is a corporation organized under the laws of the State of South Carolina and doing business in the State of Alabama.

**Jurisdiction and Venue**

4. This Court has jurisdiction over the subject matter of this action under 31 U.S.C. §§ 3730 and 3732.

5. This Court has jurisdiction over the defendant because the defendant has received payments from USAID within this judicial district.

6. Venue is proper in this judicial district under 31 U.S.C. § 3732(a) and under 28 U.S.C. §§ 1391(b) and 1395(a).

**Background**

7. The USAID is an independent Federal Government agency that receives overall foreign policy guidance from the Secretary of State. USAID was created in 1961 by Executive Order upon the signing of the Foreign Assistance Act into law. Since that time, USAID has been the principal United States agency to extend assistance to countries recovering from disaster, trying to escape poverty, and engaging in democratic reforms.

8. The agency works to support long-term and equitable economic growth and to advance United States' foreign policy objectives by supporting economic growth, agricultural development, global health, conflict prevention, and developmental relief. Pursuant to its stated mission, USAID has country offices known as "missions" in over 70 countries worldwide.

## The PDM 001-2000 Contract

9. Following the tremendous devastation caused by Hurricane Mitch in 1998, USAID financed reconstruction efforts in several countries in Central America, including the country of Honduras.

10. In connection with one such reconstruction effort – municipal development project No. 001-2000 ("PDM 001-2000 Contract") – USAID worked in collaboration with the Honduran Social Investment Fund ("FHIS"), a Honduran government agency. The PDM-001-2000 Contract provided for the construction and reconstruction of potable water systems, sewer systems, and basic environmental sanitation infrastructures at several locations throughout Honduras.

11. In 2000, FHIS solicited bids for the PDM 001-2000 Contract. The solicitation required, among other things, that FHIS award the contract to the pre-qualified applicant that submitted the lowest overall bid. The solicitation further required that each bidder be pre-qualified to compete for the contract by obtaining a minimum score of 65%.

12. In June 2000, DRC submitted a pre-qualification package to an evaluation committee for the PDM 001-2000 Contract. **Exhibit A**. DRC's pre-qualification package contained numerous material representations to USAID and FHIS regarding the contractor's available equipment and inventory, personnel, and financial obligations to assist the Government in determining whether DRC should be awarded the PDM 001-2000 Contract.

13. After a comprehensive review of DRC's pre-qualification submission, the evaluation committee for the contract awarded DRC a bid score of 71.75%. Based upon this score, FHIS awarded the PDM 001-2000 Contract to DRC in the amount of $17,677,966.96.

**DRC's Efforts To Defraud The Government**

14. From the inception of the solicitation process through contract termination, DRC engaged in a well-coordinated scheme to mislead and defraud USAID and FHIS in order to obtain money from the U.S. Government.

15. Indeed, during every stage of the procurement process for the PDM 001-2000 Contract, DRC knowingly made false statements and/or submitted false claims to the Government regarding its qualifications and its performance of the work called for by the contract. As a result of this misconduct, DRC has improperly obtained millions of dollars in federal funds.

**DRC's False Statements Regarding Its Qualifications**

16. DRC has knowingly made false statements to the Government concerning its contractor-owned inventory and equipment in order to pre-qualify for the contract.

17. In its pre-qualification submission, DRC identified 283 pieces of machinery, valued at $9,727,389.00, as contractor-owned inventory, and the contractor certified that it owned all of this machinery. See, id. at Form G-1.

18. An investigation by the USAID Office of Inspector General has revealed, however, that DRC owned only 60% of the value of the equipment listed in its pre-

qualification submission and that the remaining 40% of the value of this equipment was owned by another company – SJ&L.

19. Despite the fact that DRC did not own almost half of the listed equipment and inventory in its pre-qualification submission, the contractor concealed this information from the Government by submitting a false certification in its pre-qualification submission. The Government has relied upon DRC's false statements and certification regarding inventory and equipment, resulting in the award of the PDM 001-2000 Contract to an unqualified bidder and in the Government being harmed.

20. DRC has also knowingly made false statements to the Government regarding its available personnel for the PDM-001-2000 Contract.

21. In its pre-qualification submission, DRC listed 32 individuals as employees of the company who specialized in sanitation works. Exhibit A at Form F-2.

22. The Government's investigation has revealed, however, that many of these individuals were either employed by another company at the time of the submission, or the listed individuals were fictitious employees: Six of the individuals – Michael B. Tew, Lee W. Wilson, Scot A. Williams, M. Todd Owen, Steve T. Nipper and Timmy L. Connell – were employed by SJ&L. In addition to these SJ&L employees, DRC incorrectly identified the following employees on Form No. F-2: William Broadus; George Hammitt; Ronald Carpenter; Lee Moore; Pamela Lee; Le Artice Cecil; and Lee More. The Government's investigation has revealed that William Broadus did not have a personnel file at DRC; George Hammitt worked for DRC, for approximately one month,

seven years before DRC's pre-qualification submission; Ronald Carpenter never worked for DRC; Lee Moore and Le Artice Cecil More are the same person; and Pamela Lee, who was listed as an engineer on the pre-qualification form, was a secretary with DRC.

23. Despite the fact that DRC did not employ approximately one-third of the personnel delineated in its pre-qualification submission, the contractor concealed this information from the Government by making false statements in its pre-qualification submission. The Government has relied upon DRC's false statements in evaluating DRC's pre-qualification submission, resulting in the award of the PDM 001-2000 Contract to an unqualified bidder and in the Government being harmed.

**<u>DRC's False Claims For Payment</u>**

24. DRC's efforts to deceive the Government in connection with the PDM 001-2000 Contract continued following contract award. Specifically, DRC presented false invoices that incorrectly certified that DRC performed the work required by the contract.

25. The PDM 001-2000 Contract expressly required that DRC obtain the written consent of the Government before entering into any subcontract agreements with respect to the work called to be performed under the contract. In particular, the contract provides that, "**USAID's prior written consent to any assignment of obligations under the Contract, in addition to the consent of the Contracting Agency is required.**" Exhibit B at § 14A (Assignment, Subcontract Clauses and Procurements) (emphasis supplied).

26. Although DRC represented to the Government that the company had not assigned any of its obligations under the contract to subcontractors, an investigation by the Government has revealed that DRC improperly subcontracted for 22 of the 23 projects performed under the Contract.

27. The investigation further revealed that DRC's efforts to enter into subcontract agreements to perform this work commenced with regard to at least one subcontractor – Eterna, S.A. Company – before the contract was awarded by the Government.

28. Moreover, following award of the PDM 001-2000 Contract on June 21, 2000, DRC proceeded to quickly enter into additional agreements with other subcontractors: DRC subcontracted 17 of the 22 projects called for by the Contract to Nacional de Ingenieros S.A. de C.V; 2 of the projects to Servicios y Representaciones para la Industria y la Construccion de R.I de C.V (SERPIC); 1 project to Construcciones, Representacion, Diseno y Calculo S. de R.L. de C.V. ("CORDICA") and 1 project to Garcia Perez & Asociados S. de R. L. de C.V. ("GAP").

29. DRC neither requested, nor received, prior written approval from USAID or FHIS to authorize any of these subcontracts as required by the PDM-001-2000 Contract. Notwithstanding this fact, the company relied almost exclusively upon these unauthorized subcontractors to satisfy its obligations under the PDM 001-2000 Contract, at a significantly lower cost. Moreover, DRC took steps to conceal its use of these unauthorized subcontractors from USAID.

30. DRC also submitted false invoices for payment to the Government in connection with this scheme to hire subcontractors to perform its contractual obligations.

31. Specifically, during the period July 21, 2000, and May 10, 2002, DRC submitted 28 invoices for payment under the PDM 001-2000 Contract which falsely certified that DRC had completed the work required by the contract. See **Exhibit C1-C28.** Moreover, DRC falsely certified to the Government that it was performing the work under the Contract.

32. Each of the 28 invoices contained a certification of performance for payment that provided that: "DRC, Inc. CERTIFIES THAT: the services (or equipment and materials) for which payment is requested have been satisfactorily performed (delivered) and the payment requested is in accordance with the terms of the contract No. (Contract Number)." Id. Based upon this false certification, the Government has paid $12,697,519.83 to DRC.

33. A Government audit has revealed that DRC in turn paid $7,489,663.00 of these funds to its subcontractors, resulting in a profit to DRC in the amount of $5,207,856.83.

34. Because DRC has made false statements to the Government regarding its qualifications to perform the PDM-001-2000 Contact and the contractor has caused the submission of false invoices to the Government for payment under the PMD 001-2000 Contract, DRC is liable to the Government under the False Claims Act, 31 U.S.C. §§ 3729-33, as amended, and the common law.

**Count I**
**(False Claims Act Causing False Claim To Be Presented To The United States)**

35. Plaintiff restates and incorporates by reference the allegations set forth in paragraphs 1 to 34 above.

36. During the period from June 2000 to May 2002, DRC made false statements to the Government in order to qualify for the award of the PDM 001-2000 Contact; and the contractor presented, or caused to be presented, 28 invoices for payment under the Contract that falsely certified that DRC performed all of the work under the contract.

37. Based upon these false statements and false claims for payment, the United States of America has paid DRC a total of $12,697,519.85.

38. Plaintiff, the United States of America, relied upon DRC's false and fraudulent statements and claims in paying these invoices, resulting in it being damaged.

39. DRC is therefore liable to the Government for three times the amount of these damages – which are to be determined at trial – plus a civil penalty of between $5,500 and $11,000 for each false statement and false invoice that the company has submitted to the Government.

**Count II**
**(Unjust Enrichment)**

40. Plaintiff restates and incorporates by reference the allegations set forth in paragraphs 1 to 39 above.

41. During the period June 2000 to May 2002, DRC made false statements to the Government in order to qualify for the award of the PDM 001-2000 Contact and the contractor presented, or caused to be presented 28 invoices for payment under the Contract that falsely certify that DRC performed all of the work under the Contract.

42. Based upon thesc false statements and false claims for payment, the United States of America has paid DRC a total of $12,697,519.85.

43. DRC has been unjustly enriched by reason of the Government's erroneous and mistaken payment of monies to the defendant.

44. DRC is therefore liable to the Government for the amount of its unjust enrichment, which is to be determined at trial, together with costs and interest.

**Count III**
**(Common Law Fraud)**

45. Plaintiff restates and incorporates by reference the allegations set forth in paragraphs 1 to 44 above.

46. During the period June 2000 to May 2002, DRC has made false statements to the Government in order to qualify for the award of the PDM 001-2000 Contact; and the contractor has presented, or caused to be presented, 28 invoices for payment under the Contract that falsely certify that DRC performed all of the work under the Contract.

47. Based upon these false statements and false claims for payment, the United States of America has paid DRC a total of $12,697,519.85.

48. DRC committed fraud by submitting false invoices for payment to the Government.

49. Defendants are, therefore, liable to the United States for the amount of these fraudulently obtained funds, which is to be determined at trial, together with costs and interest.

**Count IV**
**(Payment By Mistake)**

50. Plaintiff restates and incorporates by reference the allegations set forth in paragraphs 1 to 49 above.

51. During the period June 2000 to May 2002, DRC made false statements to the Government in order to qualify for the award of the PDM 001-2000 Contact; and the contractor has presented, or caused to be presented, 28 false invoices for payment under the Contract that incorrectly certified that DRC performed all of the work under the Contract.

52. Based upon these false statements and false claims for payment, the United States of America has paid DRC a total of $12,697,519.85.

53. Plaintiff, the United States of America, has paid these funds to DRC under the mistaken belief that all of the work performed under the PDM-001-2000 Contact had been performed by the contractor. A Government investigation, however, has revealed that DRC improperly subcontracted this work without the prior written approval of the Government.

54. Defendants are, therefore, liable to the United States for the amount of the Government's damages resulting from this payment by mistake, which is to be determined at trial, together with costs and interest.

WHEREFORE, plaintiff, the United States of America, prays that judgment be entered in its favor against the defendants as follows:

A. On Count I, the amount treble the United States' actual damage, plus a civil penalty in the amount of $11,000 for each of the 28 false invoices that the defendants have submitted to the Government for payment;

B. On Count II, the amount by which defendants have been unjustly enriched by the Government's payment of their false claims;

C. On Count III, the amount of the United States' harm resulting from the defendant's fraudulent conduct together with costs and interest;

D. On Count IV, the amount of the United States' harm resulting from defendant's fraudulent conduct together with costs and interest;

E. Equitable relief through an accounting of the proceeds of the fraud and the enforcement of a constructive trust and or equitable lien upon such proceeds, to the extent that the United States' legal remedy proves inadequate;

F. Any and all other and further relief as the Court may deem just and equitable.

Respectfully Submitted,

KENNETH L. WAINSTEIN, D.C. BAR # 451058
United States Attorney

R. CRAIG LAWRENCE, D.C. BAR # 171538
Assistant United States Attorney

LAURIE WEINSTEIN, D.C. Bar #389511
Assistant United States Attorney
555 4th Street, N.W. Room E4820
Washington, D.C. 20530
(202) 514-7133

September 14, 2004

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 16 day of September, 2004, a copy of the foregoing Complaint was mailed, postage prepaid to counsel for the defendant

Eric A. Dubelier, Esq.
Reed Smith
1301 K Street, N.W.
Suite 100-East Tower
Washington, D.C. 20005-3373

Assistant United States Attorney